Amen and Rose Wardy v. Commissioner.
Wardy v. Commissioner
Docket No. 3818-63.
United States Tax Court
T.C. Memo 1966-210; 1966 Tax Ct. Memo LEXIS 75; 25 T.C.M. (CCH) 1070; T.C.M. (RIA) 66210; September 26, 1966
Towner Leeper, Southwest National Bank Bldg., El Paso, Tex., for the petitioners. John D. Laflin, for the respondent. MULRONEY Memorandum Findings of Fact and Opinion MULRONEY, Judge: Respondent determined deficiencies in the petitioners' income taxes and additions to tax as follows: Additions to tax,
Income tax § 6653(b) of
Year
deficiency
the 1954 I.R.C.
1957
$30,790.21
$15,395.11
1958
3,698.02
1,849.01
1959
15,691.54
7,845.77
In an amendment to his answer respondent claimed the following increased deficiencies and additions to tax: Additions to tax,
Income tax § 6653(b) of
Year
deficiency
the 1954 I.R.C.
1957
$17,806.87
$8,903.43
1958
1,196.39
598.20 Petitioners have *76 filed a claim for refund of income taxes for 1959 in the amount of $1,359.63. The issues are (1) whether respondent correctly computed petitioners' income for 1957, 1958 and 1959 by use of the net worth plus nondeductible expenditures method; (2) whether any part of the petitioners' underpayment of taxes for 1957, 1958 and 1959 was due to fraud within the meaning of section 6653(b) of the 1954 I.R.C.; and (3) whether the years 1957 and 1958 are barred by the statute of limitations. It is stipulated that the statutory notice of deficiency was timely issued as to the year 1959. Findings of Fact Amen and Rose Wardy, husband and wife, are residents of El Paso, Texas. They filed joint income tax returns for 1956 through 1959 with the district director of internal revenue, Austin, Texas. During the years in question there was an agreement between the United States and Mexico covering the import of farm workers from Mexico. Upon arrival in the United States the farm workers were processed and contracted out to farmers for field work. While being processed, both upon entering the United States and upon returning to Mexico, the farm workers were fed by the *77 United States Government. When the farm workers were contracted out as farm laborers, their meals were the responsibility of the individual farm employers. Petitioner was the successful bidder on the annual contracts with the U.S. Government to feed immigrant Mexican farm workers during the fiscal years beginning July 1, 1956, 1957, 1958 and 1959. Under the terms of these contracts the petitioner was required to serve meals of a specified quality and quantity at a fixed contract price to the Mexican workers while they were being processed through the El Paso Reception Center. The United States Government had supervision in the kitchen at the center to oversee the menus, equipment, inventory and the actual feeding. Petitioner purchased certain equipment and fixtures from the previous contractor for use in the operation of the reception center. Petitioner's income tax return for 1956, as part of the expenditure schedule for the operations at the center, shows the cost of furniture and fixtures acquired in July 1956 in the amount of $675.21. Petitioner acquired additional furniture and fixtures, and a shed, in the total amount of $1,370.81 during 1957. Petitioner was also furnished *78 space by the United States Government to sell nonalcoholic beverages, candy, food, drugs, dry goods, novelties, notions and other merchandise, and he was entitled to retain all the revenues from such concession sales. Petitioner personally kept the accounts for collections from concessions and dry goods sales. Pesos were accepted in payment for merchandise and they would subsequently be converted into dollars. During the busy season the concession and dry goods divisions would be open from about four in the morning until about midnight. Two shifts of sales girls were employed in these operations. During the same period (fiscal years starting on July 1, 1956, 1957, 1958 and 1959) petitioner sold meals and/or box lunches to farmers or to associations of farmers for feeding the Mexican workers subsequent to their processing at the reception center. Petitioner personally kept the accounts for all such sales in 1957, 1958 and 1959, recording the receivables and collections in an accounts receivable ledger. Petitioner worked from 10 to 20 hours a day, seven days a week, in his business at the reception center. Petitioner's wife, Rose, also worked at the reception center. On their joint *79 income tax returns for 1956 through 1959, petitioner and his wife referred to their business activity at the reception center as Rio Vista Farms. Petitioner employed a part-time accountant during 1957, 1958 and 1959 at $20 per month to summarize certain of his business transactions at the reception center and to prepare his Federal income tax return. Petitioner supplied the information, some of which was in summary form, to his accountant at intervals of from one to three months. The accountant did not reconcile petitioner's bank accounts during this period. During the years 1957 through 1959 petitioner, in his method of accounting for income from the operations of the reception center, deducted expenses when paid and also deducted costs of merchandise purchased when paid or when the accounts payable relating to such purchases were paid. Government meals were generally included in income when payments were received by the petitioner for billings covering such meals. The government supervisors kept daily reports of the number of meals served to the farm workers, and from such reports the petitioner would bill the United States Government weekly for the meals served. Petitioner *80 billed the farmers monthly for the meals served to the farm workers on their behalf. When petitioner Amen obtained the contract to feed immigrant Mexican farm workers at the El Paso Reception Center for the fiscal year beginning July 1, 1956, he transferred the operation of the City Market Cafe, which petitioner was then operating, to his wife's relatives, Olga and Matt Cook. Although it was the understanding of the parties that petitioner would receive rentals of $75 a month, he did not actually receive any rentals from the Cooks until January 1961. As of December 31, 1957 the Cooks owed $900 in rentals to petitioner and, in addition, they owed petitioner the amount of $800.33 for loans and merchandise. During 1958 Rose Wardy made two loans of $200 each to the Cooks which, together with the unpaid rentals for 1958, increased the account receivable owed by the Cooks to petitioners as of December 31, 1958 from $1,700.33 (balance as of December 31, 1957) to $3,000.33, and as of December 30, 1959 the account receivable from the Cooks was in the amount of $3,900.33. Respondent, in his net worth statement, took petitioner's hybrid method of accounting into consideration and included (under *81 liabilities and deferred income) the amounts attributable to the unpaid rentals from the Cooks as of December 31, 1957, 1958 and 1959. In their joint income tax return filed by petitioner and his wife for 1956 they reported gross receipts of $73,569.39 from "Govt. Meals" for the period from July 1, 1956 to December 31, 1956; $15,559.31 from "Candy & Sodas" and $12,320.02 from "Dry Goods" for the same period in their operation of the reception center. Petitioner and his wife also reported in their 1956 return gross receipts of $19,024.70 and a net loss of $3,439.72 from the operation of the City Market Cafe in El Paso, Texas. In 1957 petitioner submitted claims or vouchers to the Department of Labor for meals served to Mexican workers totaling about $100,000. Petitioner received checks from the United States Government for meals served to the Mexican workers in 1957 in the amount of $103,030.94. Petitioner reported gross receipts from Government meals in the amount of $62,025.31 in his 1957 income tax return. Petitioner also reported gross receipts of $19,644.09 from candy and soda sales and $14,157.44 from sales of dry goods at the center. In 1957 petitioner received total payments *82 of $27,645.10 from various individuals and farm associations for box lunches sold to them. Petitioner did not report any receipts for these box lunches (hereinafter sometimes called Association meals) in his 1957 income tax return. Petitioner reported gross receipts on his 1958 income tax return from Rio Vista Farms in the following amounts: Government meals, $48,065.05; Associations, $29,817.50; candy and soda, $16,837.42; and dry goods, $17,215.33. In 1958 petitioner received United States Government checks for meals served to immigrant Mexican farm workers in the total amount of $64,440.61, and during the same year petitioner received a total of about $31,900 for Association meals. Petitioner reported gross receipts on his 1959 income tax return from Rio Vista Farms in the following amounts: Government meals, $53,433.05; Associations, $28,750; concessions, $22,246.43; and dry goods, $16,413.08. In 1959 petitioner received United States Government checks for meals served to immigrant Mexican farm workers in the total amount of $60,480.71, and during the same year petitioner received a total of about $30,200 for Association meals. During the years here relevant petitioner owned *83 a 20 percent interest in a venture known as Ayoub and Wardy Real Estate (or the Ayoub and Wardy Real Estate Fund). The remaining 80 percent interest was owned by the Ayoubs - Zacchia, Halem, Fred and Carem - the mother and brothers of Rose Wardy. Petitioner made continuing investments in the enterprise over the years 1957 through 1959. The Ayoub and Wardy Real Estate Fund, in addition to its other activities, formed a venture known as George Ayoub and Associates for the acquisition in May 1957 of property called Dyer Street Industrial. The Ayoub and Wardy Real Estate Fund owned a 50 percent interest in this venture. Petitioner's outstanding balances in the escrow account at the Mortgage Investment Company of El Paso, Texas, as of December 31, 1956, 1957 and 1958 were $227.71, $297.74 and $339.69, respectively. There was no outstanding balance in this escrow account as of December 31, 1959. Ayoub Brothers was a venture consisting of Zacchia, Halem, Fred and Carem Ayoub. During the period here involved both petitioner and his wife made loans in varying amounts to Ayoub Brothers which were outstanding as of December 31, 1957, 1958 and 1959. In 1957 petitioner acquired a Chevrolet *84 truck and a Ford station wagon. During the years here involved petitioner used the station wagon 50 percent of the time for personal reasons. Respondent, in his statutory notice of deficiency, determined the petitioners understated their taxable income for the years 1957, 1958 and 1959 in the respective amounts of $60,891.34, $12,471.13 and $38,388.88. Respondent computed these understatements of taxable income by use of the net worth method, as follows: Dec. 31,
Dec. 31,
Dec. 31,
Dec. 31,
1956
1957
1958
1959
ASSETS
Cash
$24,445.17
$ 24,592.37
$ 33,744.60
$ 20,645.32
Notes & accounts receivable
9,000.00
56,273.62
35,202.45
46,054.84
Inventory
1,500.00
17,606.39
13,500.00
11,500.00
Stocks
14,625.30
14,923.35
30,953.90
Furniture & Fixtures
16,839.49
16,839.49
16,839.49
18,413.01
Investment - Industrial Fund
2,093.20
3,329.27
4,576.56
5,488.30
Real Estate
26,000.00
30,250.00
29,800.00
49,281.56
Autos & Trucks
450.00
6,575.00
6,575.00
6,575.00
Total Assets
$80,327.86
$170,091.44
$155,161.45
$188,911.93
LIABILITIES
Outstanding checks
$ 5,172.30
$ 426.60
$ 1,595.91
Accounts, notes and mortgages payable
$20,758.57
35,971.71
18,902.37
11,108.81
Reserve for depreciation
9,112.58
10,641.75
13,585.73
15,542.44
Deferred income
1,048.00
1,128.00
Total Liabilities
$29,871.15
$ 51,785.76
$ 33,962.70
$ 29,375.16
Net worth
$50,456.71
$118,305.68
$121,198.75
$159,536.77
Less: Net worth end of preceding year
50,456.71
118,305.68
121,198.75
Increase in net worth
$ 67,848.97
$ 2,893.07
$ 38,338.02
Plus: Personal living expenses and other unallowable
amounts paid
5,549.43
23,845.99
12,072.94
Total
$ 73,398.40
$ 26,739.06
$ 50,410.96
Less: Nontaxable portion of capital gains
29.34
469.48
488.16
Dividend exclusion
100.00
100.00
100.00
Unrealized capital gain
2,816.52
2,683.76
Exemption credits
2,400.00
2,400.00
1,800.00
Standard Deduction
1,000.00
1,000.00
1,000.00
Total reductions
$ 3,529.34
$ 6,786.00
$ 6,071.92
Taxable income corrected
$ 69,869.06
$ 19,953.06
$ 44,339.04
Taxable income, per return
8,977.72
7,481.93
5,950.16
Understatement of taxable income
$ 60,891.34
$ 12,471.13
$ 38,388.88
*85 In an amendment to his answer filed after the trial, respondent claimed additional deficiencies and additions to tax for 1957 and 1958 based upon a revised net worth statement which showed understatements of taxable income by petitioners in 1957 and 1958 in the respective amounts of $86,710.32 and $15,624.46. The respondent's revised net worth statement as it appears in his brief (Schedule I in the appendix of schedules filed with the brief) is as follows: Dec. 31,
Dec. 31,
Dec. 31,
Dec. 31,
1956
1957
1958
1959
ASSETS
Cash on Hand
$ 5,150.00
$ 5,300.00
$ 5,300.00
$ 5,350.00
Cash in Banks: Rio Vista Concessions, Southwest National Bank
12,315.66
1,657.72
Amen Wardy, Southwest National Bank
4,370.91
3,926.04
2,055.53
1,819.57
Amen Wardy, Citizens State Bank, Ysleta
2,301.85
1,706.53
4,653.41
840.67
Amen Wardy, Real Estate, Southwest National
Bank
1,010.34
4,472.21
148.33
1,960.53
Amen Wardy, State National Bank
832.15
5,590.10
9,477.37
Mrs. Amen Wardy, Southwest National Bank
781.34
903.40
1,045.05
454.35
Rio Vista Concessions, Kitchen, State National Bank
4,442.21
Rio Vista Concessions, State National Bank
9,558.61
3,427.58
4,690.27
580.50
Rio Vista Concessions, El Paso National Bank
6,246.18
14,475.86
666.07
Cash in Banks - continued
Rio Vista Bracero Service, State National Bank
(Bracero)
$ 1,420.57
$ 886.05
$ 455.05
Mrs. Amen Wardy, State National Bank (Peso
Account) Dollars
369.54
17.86
17.86
Rio Vista Concessions, State National Bank (Peso
Account) Dollars
$ 129.84
116.08
35.52
510.00
Rio Vista Bracero Service, State National Bank
(Peso Account) Dollars
509.84
140.80
152.80
Savings Account, A. Wardy, Southwest National
Bank
763.54
1956 Income tax overpayment applied to 1957
estimate
290.80
Automobile '57 Mercury, A. Wardy, Jr.
3,625.00
3,625.00
3,625.00
Home, 136 Anita Circle
18,000.00
18,000.00
18,000.00
18,000.00
Escrow Account, Mortgage Investment Co.
252.14
304.17
364.12
Automobile, Check # 1298, Rio Vista Concessions,
Southwest National
650.00
650.00
650.00
Inventory
1,500.00
17,606.39
13,500.00
11,500.00
Notes Receivable: Margarito R. Mendez
9,000.00
8,814.96
6,355.75
3,489.34
Thomas L. Bilbo (Boznos)
3,214.03
3,001.45
George Baroody
6,500.00
9,800.00
200.00
Frank Magdalano
2,000.00
Border Tobacco Co. - Amen Wardy
8,000.00
56,947.00
27,079.50
10,000.00
Border Tobacco, Fireworks Account
4,500.00
4,500.00
4,500.00
Border Tobacco, Inc. - Mrs. Amen Wardy
4,675.92
4,675.92
Border Produce Co.
880.00
Abdou Chagra
777.33
353.31
Southwestern Produce
3,303.87
1,650.00
1,943.46
12,200.00
Arturo Arguelles
7,000.00
Olga and Matt Cook
1,700.33
3,000.33
3,900.33
Daniel Martinez
11,500.00
11,182.65
Pedro Jimenez
10,753.68
10,245.03
Ayoub Bros. - Rose Wardy
4,758.66
6,608.66
4,608.66
Ayoub Bros. - Amen Wardy
3,000.00
3,000.00
Ramon Aguirre
500.00
Alma L. Deal
1,425.00
1,425.00
1,425.00
A. Navarro - Loan
600.00
600.00
John F. Ayoub
2,500.00
2,500.00
2,500.00
Artesia Alfalfa, Southwest National Bank, Check
# 1365 5-22-57
100.00
100.00
100.00
Stocks, E. F. Hutton & Co.
1,136.13
15,257.43
17,370.99
26,602.52
Financial Industrial Fund
2,093.20
3,329.27
4,576.56
5,488.30
Lots - Wells & Schaeffer
2,350.00
2,350.00
2,350.00
Dyer Street Property, 1957 (Geo. Ayoub & Assoc.)
Not reflected in Exh. CJ
1,053.00
1,053.00
1,053.00
A & W Real Estate
3,400.00
10,450.00
36,180.00
George Ayoub & Associates, Check # 115, Amen
Wardy, State National
400.00
400.00
City Market Furniture & Fixtures
15,348.28
15,348.28
15,348.28
15,348.28
Rio Vista Concessions, Furniture & Fixtures
675.21
2,046.02
2,004.07
3,577.62
Auto & Truck
450.00
6,575.00
6,575.00
6,575.00
Escrow - Courthouse Realty
1,000.00
Ruidoso Land
2,200.00
TOTAL ASSETS
$114,931.72
$228,486.92
$214,039.46
$229,079.82
Liabilities and Deferred Income: Outstanding Checks
5,115.10
7,820.06
2,375.49
3,773.09
Accounts Payable
7,204.43
21,502.42
5,482.47
2,167.64
Ayoub Brothers
453.00
453.00
Jefferson Standard Life Ins. Co.
4,275.00
3,825.00
3,262.50
2,025.00
Mortgage Investment Co.
3,655.44
3,256.23
1,835.44
State National Bank
3,500.00
Wells Schaeffer - Edward J. Wells
2,125.70
1,927.50
1,296.21
Ervin E. Schmutz
6,553.16
5,908.82
3,165.87
Reserve for Depreciation
9,112.58
10,624.98
13,016.35
14,510.51
Deferred Income - Sale - Tremont Property
4,914.00
4,914.00
4,232.60
4,032.40
Alma Deal
475.00
475.00
475.00
George & Acacia E. Boznos
988.92
923.45
Liabilities and Deferred Income - continued
Border Produce
$ 80.09
Olga and Matt Cook
$ 925.33
$ 1,825.33
2,725.33
Total Liabilities
$ 40,829.71
$ 64,877.54
$ 39,040.47
$ 32,461.72
Net Worth
$ 74,102.01
$163,609.38
$174,998.99
$196,618.10
Net Worth End of Prior Year
$ 74,102.01
$163,609.38
$174,998.99
Increase in Net Worth
$ 89,507.37
$ 11,389.61
$ 21,619.11
Add: Nondeductible Personal Expenditures
$ 9,993.49
$ 15,506.01
$ 14,040.87
$ 99,500.86
$ 26,895.62
$ 35,659.98
*86 DECEMBER 31,
DECEMBER 31,
DECEMBER 31,
1957
1958
1959
Technical Adjustments
Capital Transactions
Net long-term capital gain de-
duction-F.I.F. Exh. 63-BN
$ (29.33)
$ (24.79)
Net long-term capital gain deduc-
tion-Tremont St. Property
(146.88)
Taxable portion capital gain-Dyer
St. Property
33.89
$ 108.94
Taxable portion capital gain-Dyer
St. Property
291.55
Nondeductible capital loss carry-
over-Loss on corporate stock 1959
1,566.03
Southwestern Produce-1956 trans-
action
250.00
Loss Ayoub & Wardy Real Estate-
Operations-Paisano Street - per
return
(60.10)
(291.38)
Robbery Loss-1959-per return
(441.90)
Dividend exclusion
(100.00)
(100.00)
(100.00)
Net Technical Adjustments
$ (129.33)
$ (47.88)
$ 1,133.24
Adjusted Gross Income
$99,371.53
$26,847.74
$36,793.22
Less: Exemptions-per return
$2,400.00
$2,400.00
$1,800.00
Itemized deductions or stand-
ard deduction
1,283.49
3,683.49
1,367.85
3,767.85
1,000.00
2,800.00
Taxable Income
$95,688.04
$23,079.89
$33,993.22
Taxable Income-per return
8,977.72
7,481.93
5,950.16
Understatement of taxable income
$86,710.32
$15,597.96
$28,043.06
Income tax, corrected (1957-alterna-
tive tax)
$50,528.94
$ 6,450.36
$11,396.61
Add: Self employment tax
141.75
141.75
180.00
$50,670.69
$ 6,592.11
$11,576.61
Less dividend credit
5.40
13.81
10.40
Income tax due
$50,665.29
$ 6,578.30
$11,566.21
Tax per return
2,068.21
1,693.96
1,359.63
Deficiencies
$48,597.04
$ 4,884.34
$10,206.58
Addition to tax-Section 6653(b)
$24,298.52
$ 2,442.17
$ 5,103.29
*87 A part of the underpayment of tax for each of the years 1957, 1958 and 1959 was due to fraud with intent to evade tax. The returns for the years 1957 through 1959 were false and fraudulent with intent to evade tax. Opinion Respondent was fully justified in using the net worth plus nondeductible expenditures method in computing the petitioners' taxable income for the years 1957 through 1959. Even where a taxpayer offers books and records which purport to give a true picture of his operations, the net worth method may provide strong evidence, in itself, that such books are unreliable. Morris Lipsitz, 21 T.C. 917, affd. 220 F. 2d 871. Here, it is quite apparent that the petitioner's books and records were far from complete. Petitioner failed to keep any records of some transactions over this period, and the records that he did keep, or were kept for him by his part-time bookkeeper who was employed at $20 a month, were hardly models of orthodox accounting.[1] No reconciliation was made (or was even possible) between the petitioner's books and records and the *88 numerous bank accounts. It is significant that Thomas E. Cannon, the certified public accountant retained by petitioner to reconstruct their income over this period candidly admitted at the trial that he did not attempt a reconciliation because "[it] was my judgment that that was impossible." At the trial we were left with the impression that some of the pertinent records were still missing. Even where a set of books appears consistent on its face, such books may, in the language of the Supreme Court in Holland v. United States, 348 U.S. 121, be "more consistent than truthful," and the respondent may use the net worth method to seek out the true income of the taxpayer.
Petitioner contends that Cannon was able to reconstruct petitioner's correct net income for the three years here involved *89 on an item-by-item basis based upon an analysis of third-party records, petitioner's canceled checks and other information. This analysis, which purports to reconstruct, for each of the years involved, petitioner's gross receipts, cost of sales, expenses and profit from operations reveals (after some adjustments) a reconstructed adjusted gross income or (loss) in the years 1957 through 1959 in the respective amounts of $20,163.32, ($1,458.76) and ($7,180.07). After further deductions (for dependents and for itemized or standard deductions), the analysis arrives at a reconstructed taxable income or (loss) for these years in the respective amounts of $16,479.83, ($5,200.11) and ($10,580.07). [2]
We are persuaded that this analysis, with its glaring defects, is far from an accurate reconstruction of petitioner's taxable income. The analysis consists primarily of a verification of Government meals, purchases and other expenses, but it accepts at face value (and even reduces) *90 the sales from concessions and dry goods. Yet there is convincing evidence in the record to show that the petitioner's accounts of concessions and dry goods sales over this three-year period were incomplete and unreliable. This shortcoming in the analysis weakens it considerably since we have petitioner's testimony that his primary profitable sources of income from his operations at the reception center were the concessions and dry goods sales. It also appears that some of petitioner's existing bank accounts were not utilized in preparing the analysis and, as noted above, any bank reconciliations were "impossible." Finally, a net worth computation prepared by petitioner and attached to his brief effectively reveals the unreality of the income figures produced by his specific item analysis. Petitioner's analysis shows adjusted gross income or (loss) for 1957, 1958 and 1959 in the respective amounts of $20,163.32, ($1,458.76) and ($7,180.07), or a total of $11,524.49 for the entire period. Yet petitioner's own net worth statement shows adjusted gross income for 1957, 1958 and 1959 in the respective amounts of $9,367.79, $27,459.27 and $16,026.62, or a total of $52,853.68 for the three-year *91 period. In other words, petitioner is saying that, as measured by his own net worth statement, the specific item analysis fails to explain admitted net worth increases over the three-year period of $41,329.19 ($52,853.68 minus $11,524.49). We have carefully examined the net worth computations prepared by both respondent and the petitioner. Petitioner's computation in many respects is not supported by the evidence and in numerous instances the computation simply ignores the evidence. It would serve no useful purpose here to go into an item-by-item explanation to point out the inaccuracies of petitioner's net worth computation, but it will be sufficient to say that the nature and extent of such inaccuracies make the entire computation unreliable and we reject it. We have included respondent's net worth computation in our findings of fact in all of its detail. It shows the petitioner's taxable income for the years 1957, 1958 and 1959 in the respective amounts o6 $95,688.04, $23,079.89 and $33,993.22, with understatements of taxable income for those years in the respective amounts of $86,710.32, $15,597.96 and $28,043.06. Some of the items in the net-worth statement have been stipulated *92 by the parties, and most of the remaining items are fully supported by the evidence. Respondent has gone into minute detail on brief to marshal the evidence from various sources in support of the numerous items appearing in the net-worth statement. In addition, respondent has prepared exhaustive schedules, fully supported by the evidence, to indicate the component parts of some of the items in the net-worth computation. Based upon the entire record, we find that, with some exceptions, the items are correct as they appear in the respondent's net-worth statement in our findings of fact. It appears that the respondent, as a result of the evidence produced at the trial, has increased the amounts of some year-end balances and has decreased other year-end balances. In some instances these changes resulted in nothing more than a shift of income from one taxable year to another. Where the year-end balances have been increased, the burden of proof shifts to the respondent and, in making our findings of fact, we are satisfied that the respondent has met such burden. We believe, however, that the evidence warrants changes in some of the net-worth items and we will discuss these changes below. *93 Cash on hand, Rose Wardy. Respondent did not allow any cash on hand for Rose Wardy for any of the years here involved. [3] Petitioner argues that his wife Rose had at least $6,608.66 cash on hand as of December 31, 1956 and $1,850 cash on hand as of December 31, 1957. He testified vaguely that Rose received gifts from her parents over the years, and Halem Ayoub (Rose's brother) also testified to that effect. Rose did not testify at the trial. Petitioner gets the above figures from an exhibit which merely shows that Rose made cash loans to Ayoub Brothers in 1957 of $4,758.66 and in 1958 of $1,850. Solely from this exhibit, petitioner would have us infer that the entire amounts of the loans came from gifts made to Rose prior to 1957. Halem, in his testimony, mentioned that the gifts from the parents were, at least in part, for the children. It also appears that the loans made by Rose to Ayoub Brothers did not begin until November 1957. Rose was then working with Amen at the reception center, which they had been operating since July 1956, and the current year's earnings could just as easily have been the source of Rose's separate funds. We are not too impressed with petitioner's argument *94 as to this item. However, we believe that Rose did actually receive gifts prior to 1957 from her parents and, without much conviction, we find that Rose Wardy had cash on hand as of December 31, 1956 in the amount of $3,000 and no cash on hand as of December 31, 1957, 1958 and 1959. Escrow Account, Mortgage Investment Co. Respondent shows the year-end balances in this escrow account as of December 31, 1956 through 1958 in the respective amounts of $252.14, $304.17 and $364.12. However, we agree with petitioner that these year-end balances (as indicated by Exhibit 65BP) should be $227.71, $279.74 and $339.69, respectively. Merchandise Inventory. Respondent shows merchandise inventory as of December 31, 1956 through 1959 in the respective amounts of $1,500, $17,606.39, $13,500 and $11,500. Petitioner disagrees only with the figure of $1,500 which is the amount of the merchandise inventory as of December 31, 1956. Petitioner contends *95 that the merchandise inventory as of that date was not less than $18,000. He supports this with little more than his bare assertion at the trial that in his opinion the merchandise inventory as of December 31, 1956 was $18,000 to $20,000. Petitioner had begun his operation of the reception center in July 1956, and in his Federal income tax return filed for 1956 he showed $1,500 as a closing inventory as of December 31, 1956 in his computation of cost of goods sold. Petitioner also used this figure as his merchandise inventory as of December 30, 1956 at the reception center in a balance sheet submitted to a bank. However, it appears from evidence indicating the seasonal pattern of petitioner's operations at the center that September was generally the busiest month, that the flow of farm workers through the center would then drop off and later pick up again in mid-December until about mid-January. A witness for petitioner who was employed at the center called this latter period "one of the most busy times." The extent of petitioner's business at the center is indicated by the gross receipts reported by him in his 1956 return for Government meals, candy and sodas, and dry goods in the *96 respective amounts of $73,569.39, $15,559.31 and $12,320.02 for the period from July 1, 1956 to December 31, 1956. We have also examined evidence showing the fluctuating number of meals served each month by petitioner to farm workers during the years 1957, 1958 and 1959 and it is apparent from this evidence, as well as evidence of the fluctuating number of farm workers being processed throughout the year, that the months of December and January saw substantial activity at the reception center. Even though respondent has taken the $1,500 figure from petitioner's own tax return and records, we are nonetheless persuaded that the figure is an unrealistic one when viewed against the background of the above evidence and, moreover, it appears to be out of line with the merchandise inventories shown in respondent's net worth statement as of December 31, 1957, 1958 and 1959 in the respective amounts of $17,606.39, $13,500 and $11,500. Using our best judgment we find, on the basis of the entire record, that the merchandise inventory as of December 31, 1956 was $13,000. Border Tobacco, Fireworks Account. On August 12, 1957 Border Tobacco Company issued a check for $4,500 to petitioner with *97 the notation that it was on account of its note payable liability to petitioner. The check is endorsed by petitioner and then by "Border Tobacco Co., Inc. Fireworks Account." Respondent treats this amount as a loan from petitioner to Border Tobacco Company-Fireworks Account which was outstanding as of December 31, 1957, 1958 and 1959. The loan in this amount does not appear in respondent's original net-worth statement, and he now relies upon a series of tenuous inferences to identify this item as a loan receivable by petitioner. We cannot find, on the basis of this record, that this was an outstanding loan receivable by petitioner during any of the years here involved. Abdou Chagra. Respondent has erroneously shown the loan receivable from Chagra as of December 31, 1959 in the amount of $353.31. The correct balance as of that date, which is stipulated, is $423.98. Alma L. Deal. In January 1957 petitioner purchased for $950 a mechanic's lien contract and note in the amount of $1,425 and placed such contract and note with the Southwest National Bank for collection. The contract and note were withdrawn from the bank on July 12, 1957 and there is evidence that the note was worthless *98 by the end of 1957. Respondent did not include this asset in his original net-worth statement. We cannot find, on the basis of this record, that this purported receivable should be included among petitioner's assets for any of the years here involved. Harvey Emmett. Petitioner contends that he made two loans to Emmett prior to December 31, 1956 which had an outstanding balance of $1,650 as of December 31, 1956. But petitioner does not show any outstanding balance receivable from Emmett at the end of December 31, 1957, 1958 and 1959. The ledger in evidence shows a 1953 debit of $650 and a 1956 debit of $1,000 to the Emmett account and, consequently, we agree that the amount of $1,650 properly belongs among petitioner's notes or loans receivable as of December 31, 1956. However, there is no convincing evidence in the record to show that this same balance should not be shown outstanding as of December 31, 1957, 1958 and 1959. We therefore find that the amount receivable from Emmett remained constant throughout the years here involved, with no effect on the petitioner's changes in net worth. Joe Jabolie. Petitioner contends he made loans to Jabolie which had an outstanding balance *99 as of December 31, 1956 in the amount of $1,504.74. Again, petitioner fails to show any outstanding balance due from Jabolie as of December 31, 1957, 1958 and 1959. The ledger in evidence contains a series of debits (and some credits) in Jabolie's account beginning in 1947 and ending in December 1956. There is nothing else to indicate the status of this purported debt and we cannot find, on the basis of this record, that this debt from Jabolie was still outstanding and collectible as of December 31, 1956. Even if we were to agree that it should be included among petitioner's notes or loans receivable as of December 31, 1956, there is no justification, on the basis of this record, to find that the receivable became worthless sometime in 1957 and therefore should disappear from sight insofar as the net-worth computation is concerned. We find that the purported debt from Jabolie was not outstanding as of any of the years here involved. Aneer Abraham. Petitioner contends that he sold inventory of dry goods to Abraham in 1955 for $1,534.34 and that the balance of $784.34 which Abraham still owed petitioner as of December 31, 1956 should be included among petitioner's assets as of that *100 date in the net-worth statement. We do not agree. We are persuaded from the evidence that petitioner used a hybrid method of accounting for income during the period here involved, under which he included receivables in income only when he actually received payment, not when such receivables were accrued. Consequently, this receivable arising from a credit sale of merchandise is not properly includable among the notes and loans receivable in the net-worth statement. Financial Industrial Fund. The outstanding balances in this fund as of December 31, 1956 through 1959 have been stipulated. The stipulation shows the balance as of December 31, 1958 in the amount of $4,756.56, which is the figure used by petitioner in his net-worth statement. Respondent contends that this figure was incorrectly copied in the stipulation and that it should be $4,576.56. If this is so (we cannot tell from the record), then the correct figure can be used by the parties in their Rule 50 computation. Dell City Investment. Petitioner contends that he invested $2,450 in 1956 in a potato seed experiment at Dell City and that the investment became worthless in 1957. It is not at all clear that this item was *101 not an expense in 1956 but, at any rate, the record is too meager to establish this amount as an investment existing as of December 31, 1956 or, if it were an existing asset as of that date, that it did not continue as an asset throughout the remaining period here involved. Accounts Payable. Respondent shows year-end balances for accounts payable as of December 31, 1956 through 1959 in the respective amounts of $7,204.43, $21,502.42, $5,482.47 and $2,167.64. [4] We have fully considered the varying contentions of the parties and, based upon the entire record, we have found that the accounts payable outstanding as of December 31, 1956 through 1958 are in the above amounts. However, we do not accept the outstanding balance of $2,167.64 shown by respondent for accounts payable as of December 31, 1959. Petitioner contends that this amount should be $4,832.64, consisting of amounts owed to Kahn's Bakery, $674.76; Border Tobacco Company, $2,391.42; and Price's Creamery, $1,766.46. Petitioner has failed to reduce the balance of $1,766.46 owed to Price's Creamery by the amount of $1,261.25, which is represented by a check dated December 31, 1959 issued by petitioner to Price's Creamery. (The *102 check is in evidence and respondent has properly included it in the outstanding checks as of December 31, 1959 in computing petitioners' net worth as of that date.) The evidence also shows that this payment was to be applied to milk purchases from Price's Creamery. Consequently, the balance owed to Price's Creamery by petitioner as of December 31, 1959, reflecting the payment by check in the amount of $1,261.25, should be reduced to $505.21, and we find that the total accounts payable owed by petitioner as of December 31, 1959 was $3,571.39. Nondeductible personal expenses. Although we have found that respondent's computation for these personal expenses are correct, we believe that some discussion of this item is merited. Respondent originally determined that petitioner's nondeductible personal expenses for the years 1957 through 1959 were $4,308.74, $21,556.48 and $10,808.31, respectively. In the final net-worth statement respondent shows these nondeductible personal *103 expenses for these three years in the respective amounts of $9,993.49, $15,506.01 and $14,040.87. Unlike the usual approach in net-worth cases, respondent has not relied upon an estimate of the taxpayer's living expenses for the years in question. In fact, all attempts at the trial to elicit some information from petitioner as to his personal expenditures were singularly unproductive. Instead, respondent undertook an exhaustive analysis of expenditures made by petitioner and his wife. For the most part, the analysis is based upon specific, identified checks issued during these years, with payees and check numbers meticulously set forth (Schedule I-D, pages 1-8). Many of the checks which were identified as personal expenditures over the period of three years were so reclassified by petitioner's accountant who was retained in this case to reconstruct petitioner's income for this period out of the confused welter of original sources and records. Finally, there is evidence in the record to show that disbursements from Rose Wardy's bank account at the Southwest National Bank were generally personal, and respondent (after making allowances for some expenditures capital in nature and nonpersonal) *104 has so treated them. Petitioner makes no serious attempt to contest the accuracy of the results reached by respondent and, with the array of checks set forth, petitioner could certainly have done so. Nor does petitioner here make any effort to establish an independent figure for 1957 and 1959 - he uses the figures of $4,308.74 and $10,808.31 which were respondent's original determinations. For 1958 petitioner merely attacks certain checks which he states were erroneously included in respondent's original determination and, after eliminating these items, reaches a figure of $10,357.72 for 1958. But respondent has for the most part made proper adjustments on brief for the amounts thus singled out by petitioner. We find (recognizing respondent's burden of proof in the years 1957 and 1959 when the final computation of expenditures exceeds the original determinations) that respondent has fully established the correctness of petitioner's nondeductible personal expenditures for the years 1957 through 1959. Respondent determined that a part of the petitioner's underpayment of taxes for 1957, 1958 and 1959 was due to fraud with intent to evade tax. Section 6653(b) of the Internal Revenue Code *105 of 1954. The burden rests upon respondent to prove fraud by clear and convincing evidence. W. A. Shaw, 27 T.C. 561, affd. 252 F. 2d 681. Consistent understatement of income in substantial amounts over a period of years is evidence of fraud. Schwarzkopf v. Commissioner, 246 F. 2d 731, affirming a Memorandum Opinion of this Court. Such a pattern of substantial understatements of income is present here. There are other indicia of fraud. In 1957 petitioner received $27,645.10 for Association meals and omitted these receipts in his 1957 income tax return. In the same year petitioner received checks for Government meals of about $100,000 and only reported $62,025.31 from this source in his 1957 income tax return. In 1958 and 1959 petitioner received checks for Government meals in the respective amounts of $64,440.61 and $60,480.71 and reported the amounts of $48,065.05 and $53,433.05 from this source in his 1958 and 1959 income tax returns, respectively. There is also convincing evidence that petitioner consistently understated his concession and dry *106 goods sales at the reception center. At times, when the farm workers were being processed through the center in substantial numbers, petitioner's daily record kept for such sales records little or no activity. During some of these busy periods, the daily record is marked "closed". There are other inconsistencies in the record which further indicate that petitioner's reported sales from concessions and dry goods were understated during this period. Petitioner also failed to report a portion of his dividend income in each of the years 1957 through 1959. We are persuaded that petitioner, an exexperienced and intelligent businessman, was fully aware of his understatements of reported income. He was in direct daily control of the operations at the reception center, working there seven days a week up to twenty hours a day, and it clearly appears that he was cognizant of the financial aspects of the operations. He only felt it necessary to employ a part-time accountant at $20 a month to summarize some of his business transactions and to prepare his tax returns. Petitioner supplied the information to his accountant at intervals of one to three months. In this respect, we might point out *107 that we have considered and rejected petitioner's explanation that all the understatements of reported income during the years 1957 through 1959 were due to the accountant's ineptness. We find, on the basis of the entire record, that a part of the petitioners' underpayment of taxes for each of the years 1957, 1958 and 1959 was due to fraud with intent to evade tax, and we so hold. Our finding that the petitioners' returns with respect to the years 1957, 1958 and 1959 were fraudulent disposes of the statute of limitations issue raised by petitioners with respect to the years 1957 and 1958. Section 6501(c)(1) of the Internal Revenue Code of 1954. Decision will be entered under Rule 50. Footnotes
1. Petitioner's witness, a certified public accountant, testified that there were 75 bookkeeping errors over a three-year period, some in favor of the taxpayers and some in favor of the United States Government. He testified that "I saw every error I had ever read about or ever seen before" and then went on to say that he was able to trace and identify every one of the errors.↩
2. These results of the analysis may be compared with the taxable income actually reported by petitioner on his tax returns for 1957 through 1959 in the respective amounts of $8,977.72, $7,481.93 and $5,950.16.↩
3. Respondent has allowed petitioner Amen Wardy cash on hand as of December 31, 1956 in the amount of $5,150, and has also allowed cash on hand as of December 31, 1957 through 1959 in the respective amounts of $5,300, $5,300 and $5,350, respectively.↩
4. Petitioner agrees with the year-end balance as of December 31, 1957 in the amount of $21,502.42 but contends that the balances as of December 31, 1956, 1958 and 1959 should be $5,196.96, $5,954.12 and $4,832.64.↩